IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JOSHUA GRIFFIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:14cv16-MHT |
| | ) | (WO) |
| NEPTUNE TECHNOLOGY GROUP, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Relying on Title VII of the Civil Rights Act of
1964, as amended, 42 U.S.C. §§ 1981a & 2000e through
2000e-17, plaintiff Joshua Griffin has sued his former
employer, defendant Neptune Technology Group, claiming
that he suffered illegal retaliation for opposition to
discrimination.  Relying on the Consolidated Omnibus
Reconciliation Act of 1986 ("COBRA"), 29 U.S.C. § 1132,
Griffin also claims that Neptune illegally failed to
provide appropriate notice that he could continue his
health-insurance coverage after his termination.

The court has original jurisdiction over these claims under 28 U.S.C. §§ 1331 (federal question), 29 U.S.C. § 1132(f) (COBRA), and 42 U.S.C. § 2000e-5(f)(3) (Title VII).

This cause is before the court on Neptune's motion for summary judgment in its favor. For the following reasons, the motion will be granted on the Title VII claim and denied on the COBRA claim.

## I. SUMMARY-JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Griffin makes two types of claims.  First, he claims that, in violation of Title VII, Neptune retaliated against him for his complaints to management about harassment and retaliation by his supervisor. Second, he claims that Neptune failed to give him proper notice of his right to elect COBRA coverage. The court begins by discussing the relevant facts, which are drawn from the evidence taken in the light most favorable to Griffin.

Griffin, who is an American of African descent, started worked for Neptune, a water-meter manufacturer. His job duties included assembling, testing, and packaging meters.  Under the company's policy, employees are eligible for a merit-based pay increase every four months until they reach the top of their position's pay range; supervisors complete performance reviews of their supervisees every four months, and positive reviews

3

result in raises.   For the first nine months of his
employment, Griffin received positive reviews and
raises every four months.

In August 2011, shortly after Frank Pierce, who is
white, became Griffin's direct supervisor, Griffin
began to feel that Pierce was singling him out for
unfair treatment.   Pierce talked to Griffin in a
negative and harsh tone and frequently criticized him
when Griffin believed he was doing nothing wrong.   On
one occasion, Pierce told Griffin he was "looking
stupid" for doing something that Pierce did not
criticize a white employee for doing.   Evidentiary
Submission in Support of Motion for Summary Judgment
(Doc. No. 39-1), Deposition of Joshua Griffin, 63:16
through 64:4.   On another occasion, Pierce approached
Griffin and purposefully kicked a large metal cart that
Griffin was leaning on, potentially causing him to
fall.   Griffin observed that Pierce was also hard on
two of Griffin's black coworkers and started to be hard
on a white coworker after Griffin and the coworker

4

became good friends.  However, Griffin admits Pierce's "favorites" included several black female employees. (Evidentiary Submission in Support of Motion for Summary Judgment, Doc. No. 39-1, Deposition of Joshua Griffin, 114:19 through 115:2.)

### A. November 2011 Complaint

Soon after Pierce became his supervisor, Griffin began making complaints to various members of management about Pierce's harassment of him, in accordance with the procedure laid out in the employee handbook.  However, he vocalized concern that Pierce was motivated by race on only one occasion, in November 2011.  That time, Griffin approached Pierce's direct supervisor, Ricky Morgan, to complain that Pierce was harassing him unfairly and stated that Pierce's behavior "had something to do with" Griffin's race. Evidentiary Submission in Support of Motion for Summary Judgment (Doc. No. 39-1), Deposition of Joshua Griffin, 220:4-7.

Griffin says that, from that point until August 2012, Pierce continued to pick on him and talk negatively to him, but the evidence contained little in the way of specifics.  On one occasion, in January 2012, Pierce denied Griffin's request for vacation pay for the shift during the National Championship football game, which Pierce had granted to all other employees who requested it except one other black male employee. Griffin complained to Human Resources about Pierce's conduct in this incident but did not say that he believed Pierce's behavior was motivated by race.

Pierce gave Griffin two positive performance reviews and merit raises during this nine-month period.

## B. August 2012 Complaints

Around August 1, 2012, Pierce gave Griffin his first negative-performance review and denied him a raise.  That day, Griffin complained to the Human Resources Department about Pierce but did not mention racial motivation in his complaint.  He asked Human

6

Resources to arrange for a meeting with him, Pierce, Morgan, and Human Resources personnel present to address the problems between Griffin and Pierce. Human Resources never set up the meeting.

In the week following this complaint, Griffin became the focus of a series of troubling events documented in a series of emails and other materials. Essentially, over the following week or so, Pierce reported to Human Resources that he suspected Griffin had been smoking--a terminable offense. He and a Human Resources employee spied on Griffin to try to catch him in the act, but saw nothing. After learning of Pierce's suspicions, Morgan and Human Resources Director Jill Samuelson spoke about ways to find evidence, and Samuelson talked with the head of security about training a camera on the courtyard to try to catch Griffin smoking. Shortly thereafter, Pierce tried to find an old disciplinary warning he had issued to Griffin, and, after realizing that he had not submitted it to Human Resources, issued a new

disciplinary warning to Griffin for allegedly using his phone on the work floor the prior day.  However, there was no reason for Pierce to wait a day before writing up Griffin, and Griffin denies the accusation.  The warning, reduced to writing, was the first step in Neptune's four-step disciplinary policy leading to termination.

On August 9, 2012, the day after receiving this write-up, Griffin made a new complaint of harassment and retaliation against Pierce to Roper Industries, Neptune's parent company, through its ethics complaint hotline.  During this call, Griffin did not claim that he was being harassed on the basis of race or that he was suffering retaliation due to a complaint of racial discrimination.

The next morning Human Resources Director Samuelson received an email from Roper Industries, instructing her to investigate and make a report on Griffin's complaint to the ethics hotline, and she began contacting management about the complaint.

Later that day, after being informed of the hotline complaint, Morgan issued Griffin a written warning alleging that, on the previous day, he had held up the production line for 10 minutes. While admitting that he was not at his station, Griffin disputes that his actions had been improper and said he had been trying to get guidance from a supervisor. There was no reason for the delay in issuing the warning. Under Neptune's progressive-discipline policy, a written warning was the second step in the four-step process leading to termination.

On the following work day, Human Resources Director Samuelson wrote to a Roper Industries employee to update him on the status of her investigation and to notify him of the disciplinary actions taken against Griffin by Pierce and Morgan that week. In the email, she attempted to head off any potential concern about the two disciplinary actions coming so close on the heels of Griffin's complaint, claiming the discipline

was "in no way retaliation."  Evidentiary Submission in Response to Summary Judgment (Doc. No. 53-33).

Samuelson never interviewed Griffin or any of his co-workers on the production line about Pierce's alleged harassment and retaliation, and instead spoke only with the supervisors and managers to whom Griffin said he had complained.  Based on this limited investigation, she decided there was no merit to Griffin's complaints.

About a month later, in accordance with company policy requiring a second performance review one month after a negative one, Pierce gave Griffin a positive review, rating him 'above average' in several areas and approving him for a raise.  Two days later, Samuelson emailed Morgan to notify him of the positive review and warned: "[B]ased on this, the warnings received a few weeks ago will not be applicable if we have to move forward with any type of discipline in the future." Evidentiary Submission in Response to Summary Judgment (Doc. No. 53-16).  Morgan forwarded this email to

Pierce and reminded him that Griffin had received two
disciplinary actions, which Pierce should have
considered against Griffin when completing his most
recent review.  In the future, Morgan warned, Pierce
would have to consider all disciplinary actions during
the entire review period, not just the month prior,
when doing such reviews.  Morgan stated he would
discuss the matter with Pierce in person later that
day.

## C. Termination

On November 7, 2012, the night President Obama was
reelected, someone at Neptune played a rap song about
the President over the intercom, which could be
accessed using any telephone at the facility.  Shortly
afterwards, Pierce saw some employees--who were in a
department other than Griffin's--gathered around a
telephone but did not question them.  That night, two
people told Pierce they were offended by the song that

11

had come over the intercom,[1] and Pierce reported the incident to his superiors.

The company's management took the election-night incident seriously, although it had not reacted previously in such a way to non-business uses of the intercom.  During Griffin's employment, employees repeatedly had used the intercom system for non-business purposes, such as commenting on football games, wishing others happy birthday, and playing bits of music.  No reports were made to Human Resources about the inappropriate use of the intercom in those circumstances.[2]

Human Resources Director Samuelson determined that the phone in the department where Griffin worked had

---

1. Pierce had previously come in contact with one of the employees who complained about the song.  On that occasion, the employee, who is white, used the 'n-word' in conversation in the work place.  Pierce told him not to use that kind of language but did not write up the man or report his misconduct to anyone.

2. One supervisor admitted he had heard a television-show theme song played over the intercom but did not make a report; no one was disciplined for the incident.

been used to access the intercom. The phone was located on the desk of Griffin's 'group leader.' On November 8, 2012, Pierce emailed Morgan's supervisor the names of six employees, including Griffin and the group leader, who could have seen who used the phone. The supervisor forwarded the email to Samuelson and wrote that, "because of the employees involved" he was asking Human Resources to do the investigation.[3] Evidentiary Submission in Response to Summary Judgment (Doc. No. 53-17).

Human Resources Director Samuelson investigated the incident on a day that Griffin was not at work and did not interview him or most of his co-workers in the area. However, she did interview Griffin's group leader, who accused him of playing the song over the intercom.

---

3. Also, he asked Human Resources to confirm that the song was "A.P.T. Obama Obama Obama" and to look up the lyrics. Evidentiary Submission in Response to Summary Judgment (Doc. No. 53-17).

Without asking him his version of the events, Samuelson and Morgan decided to suspend Griffin without pay for three days as punishment for the offense. This was the third step in Neptune's four-step process leading to termination. When they met with him to tell him of the suspension, Griffin denied playing the song and insisted that he was in the bathroom when it was played.[4]  The discussion became heated, and Samuelson told Griffin that they knew he "did it because... [his] name ha[d] been bringing a lot of mess around here" as he had "called the 1-800 hotline telling them that [they] held his raise and [that he was] being harassed by" Pierce. Evidentiary Submission in Support of Motion for Summary Judgment (Doc. No. 39-1), Deposition of Joshua Griffin, 80:15-19. Griffin pointed out that he had come to them about the harassment but they had done nothing about it. At the end of the conversation,

_____

4. Another coworker had seen Griffin coming out of the bathroom while the music was being played, but she was not on the list of employees to interview, and Samuelson had not talked to her.

the managers said that Griffin would be suspended without pay for three days while they investigated further.

While he was out on suspension, two colleagues called Griffin and informed him that Human Resources had started its investigation and now was interviewing his coworkers in the area.[5]  When he got back to work, Griffin met with Morgan and Samuelson.  According to Griffin, Samuelson and Morgan reported they were done with the investigation and that they had decided to forget about the intercom incident and proceed as if it had never happened.  Evidentiary Submission in Support of Motion for Summary Judgment (Doc. No. 39-1), Deposition of Joshua Griffin, 83:12-25.

On December 7, 2012, Griffin--unsatisfied with the resolution of the intercom incident--made a complaint with the EEOC, and Human Resources Director Samuelson

---

5. A coworker told Griffin she thought he was being retaliated against for calling the ethics line, which surprised him, because he did not think anyone other than management knew about his call.

was notified of the charge by letter during the same month.  The notice made clear that Griffin alleged race-based harassment and retaliation.

On January 16, 2013, Pierce gave Griffin a positive performance review and recommended a pay increase. However, Griffin never received the pay increase because of the following events that occurred that same day.

On that day, according to Griffin, he took his allowed break.  Another employee took his place on the testing machine while he was out.  When he came off break, he noticed the machine was operating with the 'pressure tester' off.  Griffin had not turned off the pressure tester himself, for there was no advantage to be gained in terms of speed or workload by doing so. In the past, Morgan had instructed Griffin and his colleagues to run the machine with the pressure tester off when the machine was malfunctioning and even had another employee instruct them on how to do so.  The machine frequently was run with the tester off when

16

waiting for maintenance to work on the machine.
Griffin consulted with colleagues in the area about
whether there was a problem with the machine but was
informed that the machine was fine. Griffin walked to
another part of the test bench to push a button that
would send parts to his machine and started to walk
back to the pressure tester. At that point, Pierce and
the head of maintenance walked straight from the back
to Griffin's machine, hit it, and took a picture of the
screen with Pierce's cell phone. Pierce told Griffin,
"We're not running bypass mode no more," turned the
pressure tester back on, and walked off. Evidentiary
Submission in Support of Motion for Summary Judgment
(Doc. No. 39-1), Deposition of Joshua Griffin, 93:14-
94:3. Pierce then reported the event to his superiors.

After the picture was taken, Griffin continued to
operate the machine. However, because the machine was
now malfunctioning, he called for maintenance
repeatedly, but no help ever came. Two days later,
Morgan and Human Resources Director Samuelson

terminated him.  Samuelson explained in an email to senior management that Griffin had been terminated for 'operating' the machine in 'bypass mode,' instead of for 'putting' the machine in bypass mode, because the company lacked proof that Griffin intentionally had put the machine in that mode.  In the email, she identified Griffin as the person who had played the Obama song and called the ethics line "complaining about his supervisor and his mistreatment."  Evidentiary Submission in Response to Summary Judgment (Doc. No. 53-20).

Human Resources sent Griffin a termination letter, which listed the intercom incident as a prior incident justifying his termination, although Samuelson and Morgan previously had stated that the incident would be treated as if it had not happened.

Griffin did not receive notice of his eligibility for COBRA benefits.

### III. TITLE VII CLAIM

Griffin asserts that Neptune retaliated against him by harassing him and terminating him in response to his multiple internal complaints to management about harassment and retaliation.

#### A. Statute of Limitations

Before addressing Griffin's substantive claim, the court must address Neptune's argument that Griffin's Title VII claim is barred by the statute of limitations. Neptune argues that Griffin failed to file his complaint in federal court within 90 days of receiving from the EEOC a notice of right to sue.[6]

Title VII of the Civil Rights Act of 1964 requires that suit be brought within 90 days after receipt of notice of right to sue from the EEOC. 42 U.S.C.

---

6. Neptune also argues that Griffin cannot pursue his claim based on events that occurred more than 180 days before his EEOC charge. As the court will grant summary judgment for other reasons as to all events that occurred prior to that time period, the court need not reach this argument.

§ 2000e-5(f)(1).  "[T]he 90-day statute of limitations commences upon receipt of the right-to-sue letter. However, a plaintiff is required to assume some minimal responsibility to ensure receipt. ... [A] case-by-case approach [applies] in determining what constitutes receipt and when the time is triggered." <u>Stallworth v. Wells Fargo Armored Services Corp.</u>, 936 F.2d 522, 524 (11th Cir. 1991).

The court now applies the case-by-case approach here.  The relevant facts in this case are as follows. On September 17, 2013, Griffin and his attorney had a conversation with an EEOC investigator who told them he was recommending closure of the case.  On September 18, the EEOC issued a right-to-sue letter addressed to Griffin in care of his attorney.  However, Griffin's attorney did not receive this letter.  On September 24, Neptune received a copy of the letter in the mail.  On October 7, the EEOC District Director sent a follow-up letter to Griffin in care of his attorney, attaching a

copy of the original September 18 right-to-sue letter.
The October 7 cover letter stated:

> "The Commission has now received notice that the correspondence containing the Notice of Right to Sue was not delivered to the Charging Party. Delivery to the Charging Party established certain deadlines associated with a charge of discrimination. . . .  The Commission has now obtained additional address information which will facilitate delivery of notice to the Charging Party.
>
> "<u>The Charging Party has not currently received the Notice of Right to Sue from the Commission. The Notice of Right to Sue attached is being mailed on the date of this letter.</u>"

Evidentiary Submission in Support of Motion for Summary Judgment (Doc. No. 39-18) (emphasis added).  Griffin filed his lawsuit within 90 days of receiving the October 7 follow-up letter, but 104 days after Neptune received the September 18 original letter, and 110 days after the EEOC dated the original letter.

Griffin bears the "burden of establishing that he filed his Complaint within ninety days of his receipt

of the EEOC's right-to-sue letter." <u>Green v. Union Foundry Co.</u>, 281 F.3d 1231, 1233-34 (11th Cir. 2002). In his response to the summary-judgment motion, Griffin presented an affidavit from the attorney to whom the September 18 and October 7 letters were addressed, in which the attorney attested that no one in his office received the September 18 original letter prior to October 7, and that the office first received the September 18 original letter when it came attached to the October 7 follow-up letter.  As the letter was mailed on October 7, Griffin could not have received it before October 8, at the earliest.  Griffin filed suit on January 6, 2014, within 90 days of October 8.  Thus, Griffin has established that he filed suit within 90 days of <u>actually</u> receiving the EEOC's September 18 and October 7 letters.

Neptune argues, however, that the court should not use Griffin's receipt of the October 7 follow-up letter as the starting point for the 90-day period, and that the 90 days should run from the date when Neptune

22

received its copy of the September 18 original letter, on September 24.   Neptune contends that this case is controlled by two cases in which the Eleventh Circuit Court of Appeals considered whether the issuance of a second right-to-sue notice restarted the 90-day period for filing a complaint.   In Gitlitz v. Compagnie Nationale Air France, 129 F.3d 554, 557 (11th Cir. 1997), the EEOC issued a right-to-sue letter to the plaintiff, which the plaintiff received.   After contacting his congressman for assistance, the plaintiff received "a second right-to-sue letter [over two months later], which rescinded the first letter and stated that [plaintiff] had another 90 days within which to file suit."   Id. at 556.   The appellate court rejected the plaintiff's reliance on the date of the second letter in calculating the deadline for filing suit because the EEOC had not reconsidered its first decision on the merits before issuing the second letter.   Similarly, in Santini v. Cleveland Clinic Florida, 232 F.3d 823 (11th

Cir. 2000), the plaintiff's law firm received an undated right-to-sue letter and contacted the EEOC to request a dated letter. The EEOC then sent out a dated letter. The appellate court held that the plaintiff received notice on the date of actual receipt of the first letter and, accordingly, found the plaintiff's claim time-barred. The Eleventh Circuit summarized its holding in the case as follows: "As a matter of law, receipt of a second EEOC Notice does not constitute grounds for equitable tolling where a party has actual knowledge of the first Notice." Id. at 825.

Neptune's reliance on these cases is misplaced. In both cases, it was undisputed that the plaintiff actually had received the first letter in a timely manner; the question was whether, despite that receipt, the 90-day period did not run until a second letter was received. Here, in contrast, the record contains no evidence that Griffin received the September 18 original letter, and the EEOC clearly stated that the original letter had not been received. This is not a

case where the plaintiff argues that he should get a second bite at the apple because of the issuance of a second letter; here, the plaintiff never had a first bite.

Neptune also argues that the evidence establishes that the September 18 original letter and the October 7 follow-up letter were sent to the same address, so the original letter must have been received or should be assumed to have been received by Griffin when Neptune received it. Neptune is correct that the September 18 letter and the October 7 letter include the same address for Griffin, in care of his attorney's office. However, the record before the court does not contain evidence demonstrating proper mailing, such as an EEOC mail log showing that proper postage was affixed, a copy of the envelope in which the notice was first sent, or other documentation showing that the September 18 letter was mailed properly. The record does, however, include the EEOC's clear statement in the October 7 letter that the September 18 letter had not

25

been received by Griffin.  Accordingly, the court
cannot conclude that the first letter was mailed
properly to the same address as the second.  The court
will not grant summary judgment on this basis.[7]

_____

[7] Nor does <u>Kerr v. McDonald's Corp.</u>, 427 F.3d 947
(11th Cir. 2005), compel a different result.  In <u>Kerr</u>,
the plaintiffs claimed they did not actually receive
their right-to-sue letters until a month and a half
after the date on the letters.  The appellate court
characterized the issue before it as whether, "under
the test established in our circuit, actual knowledge
on the part of a complainant that the EEOC has
terminated its investigation of her claim, as evidenced
by her request for [a right-to-sue] letter, may be
sufficient to cause the time for filing to begin
running within a reasonable time after written notice
of complainant's right to sue has been mailed." <u>Id</u>. at
954.  The court concluded that the answer was yes, and
found the plaintiff's case time-barred.

<u>Kerr</u> is distinguishable from the instant case in a
number of ways. First, Neptune has not alleged, and the
record is not clear as it was in <u>Kerr</u>, that Griffin had
'actual knowledge' that the EEOC definitively had
terminated its investigation of his claim.  At the time
of the events in <u>Kerr</u>, the charging party could request
a right-to-sue letter without waiting for an official
finding; requesting a letter was tantamount to an
acknowledgement that the EEOC investigation was
completed.  <u>Id</u>. at 949 (noting that the EEOC letter
accompanying the form to request a right-to-sue notice
(continued...)

explained that "issuance of [a right-to-sue] letter represents the end of any formal EEOC action in the matter.")   In <u>Kerr</u>, the plaintiffs had verbally and in writing requested right-to-sue letters, and the court took the written requests as clear proof that the plaintiffs knew the EEOC investigation was over.   <u>See</u> <u>id</u>. at 951 ("Understanding that issuance of those letters would represent the end of EEOC involvement, both Kerr and Green Smith chose to request letters.") Here, in contrast, there is no indication that Griffin knew with certainty that the EEOC investigation was closed.   There is no evidence that he requested a right-to-sue letter as had the plaintiff in <u>Kerr</u>.   And because the investigator had only told Griffin he was recommending closure of the investigation--not that the investigation definitely was closed--Griffin would not necessarily have expected to receive a notice within a certain period of time.

Second, in <u>Kerr</u>, almost a month and a half passed between the plaintiffs' request for right-to-sue letters and their eventual receipt of the letters as part of their case files.   The <u>Kerr</u> court noted that the plaintiffs should have started calling the agency when they did not receive a letter "after several weeks" of their request.   <u>See</u> <u>id</u>. at 953.   Here, Griffin received the right-to-sue letter within several weeks of last contact with the agency.   In other words, Griffin did not sit on his hands an inordinate amount of time without inquiring into the status of the letter.

Finally, in <u>Kerr</u>, the plaintiffs received copies of their right-to-sue letters which were obviously not the (continued...)

27

## B. Retaliation Claim

"To make out a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in an activity protected under Title VII; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1211 (11th Cir. 2013).

Griffin claims he engaged in statutorily protected expression by making complaints to management about harassment and retaliation, including his November 2011 and August 2012 complaints. Such a claim is referred

---

originals but were dated a month and a half earlier, without any explanation from the EEOC, but they did not call to inquire about the discrepancy. Id. In this case, in contrast, Griffin received a letter from the EEOC that offered an explanation for the discrepancy in the dates and made clear that the operative date was the one on which the October 7 follow-up letter actually was received. For these reasons, the court concludes that Kerr does not support Neptune's argument in this case.

to commonly as an 'opposition clause' claim.  <u>See</u> 42
U.S.C. § 2000e-3(a) (prohibiting retaliation against
employees who "oppose" unlawful employment practices).
However, not all internal complaints of mistreatment
constitute protected activity under Title VII's
anti-retaliation provision.  To make out a colorable
claim of retaliation under the 'opposition clause', a
plaintiff's complaints must put supervisors on notice
that he is complaining about prohibited discriminatory
conduct; to do so, the plaintiff must allege
discrimination clearly.  <u>See, e.g.,</u> <u>Gerard v. Board of</u>
<u>Regents</u>, 324 F. App'x. 818, 826-27 (11th Cir. 2009)
(letter that did not allege race discrimination could
not form basis for retaliation claim).  <u>See also</u>
<u>Albrechtsen v. Board of Regents of Univ. of Wis. Sys.</u>,
309 F.3d 433, 436-437 (7th Cir. 2002) (letter that
complained of mistreatment of all faculty members but
did not contain words sex or gender could not have been
construed as a complaint against sex discrimination).
A complaint that merely alleges that an employee is

29

being picked on or that management is "out to get" him
does not constitute protected activity under Title VII.
See Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587,
591-92 (6th Cir. 2007).

Griffin mentioned race as a motive for Pierce's
alleged harassment in only one internal complaint, in
the fall of 2011 when he told Morgan that he thought
Pierce's harassment of him "had something to do with"
Griffin's race.  Therefore, only that complaint could
constitute protected expression; the other internal
complaints, including the August 1 and 9 complaints,
would not constitute protected expression.

Neptune, however, argues that the November 2011
complaint was not specific enough to constitute
protected expression.  At the summary-judgment stage,
the court must make all reasonable inferences in favor
of the plaintiff.  Griffin complained to a supervisor
about being harassed by Pierce and that the harassment
"had something to do with" race.  The phrase "had
something to do with" essentially means "is related

30

to". Thus, Griffin told the supervisor that he felt the harassment was related to race. This was sufficient to put the supervisor on notice that Griffin was complaining of racial discrimination and, therefore, is sufficient establish the element of protected expression under the opposition clause.[8]

Griffin also must show that he suffered a materially adverse-employment action, that is, an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Griffin clearly has met the element of a materially adverse action with regards to his termination. The record also contains evidence of materially adverse actions that occurred after his

---

8. Griffin has presented no evidence that Morgan shared Griffin's November 2011 race-discrimination complaint with others at Neptune or that others construed his complaints as challenging race discrimination. Accordingly, the court concludes that Griffin's only complaint to a supervisor that could have constituted protected expression under the opposition clause was the fall-2011 complaint to Morgan.

fall-2011 complaint.  In August 2011, Pierce and Morgan
tried to have Griffin disciplined for smoking--a
terminable offense--and, when that failed, undertook
formal disciplinary action against Griffin, twice
within a week's time, that could be used as a basis for
termination under the company's progressive discipline
policy.  This series of actions certainly would be
serious enough to give a reasonable employee hesitation
about making further complaints of discrimination.[9]

_____

    9. Griffin also contends that he suffered the
materially adverse-employment action of a hostile
environment, see Gowski v. Peake, 682 F.3d 1299,
1311-12 (11th Cir. 2012) (recognizing cause of action
for retaliatory hostile-work environment).  Griffin has
not put forth sufficient evidence to establish that he
experienced a hostile-work environment.  To establish a
hostile work environment claim under Title VII, the
plaintiff must show that "the workplace is permeated
with discriminatory intimidation, ridicule, and insult,
that is sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an
abusive working environment." Rojas v. Florida, 285
F.3d 1339, 1344 (11th Cir. 2002) (citation omitted).

    Griffin was not subjected to conditions severe
enough to constitute a hostile-work environment.
Griffin contends that, during the period after his
November 2011 discrimination complaint through July of
2012, Pierce continued to pick on him and continued to
(continued...)

32

However, Griffin cannot prove the required causal relationship between his protected expression and the adverse actions.  Evidence that harassment escalated soon after an employee made a complaint certainly could provide circumstantial evidence of a causal connection between the complaint and the mistreatment.  But here, Griffin has failed to show that Pierce's treatment of him worsened appreciably in the nine months after Griffin's 2011 complaint; indeed, he received positive performance reviews during that time.  Therefore, a

deny him the opportunity for overtime work.  The only specific incident Griffin mentions that occurred during this time period is that Pierce denied him paid time-off to watch the National Championship football game.  These actions, while certainly unwelcome, simply do not constitute the type of severe and pervasive harassment needed to show a retaliatory hostile-work environment.  Furthermore, in the midst of this time, Griffin received two positive performance reviews, which would have ameliorated the impact of any negative treatment Griffin experienced.  And as discussed below, Griffin's conditions did not get appreciably worse until August 2012, nine months after his race-discrimination complaint.  To the extent that Griffin's conditions in August 2012 became severe enough to constitute a hostile environment, Griffin lacks evidence of a causal link between the November 2011 complaint and Neptune's August 2012 actions.

reasonable factfinder could not find Pierce's conduct during that period was motivated by retaliatory animus.

Griffin's work conditions did worsen appreciably in August 2012, after Griffin made complaints to Human Resources and Roper Industries.[10]   However, the nine-month lapse between the November 2011 race-based complaint and the August 2012 events is simply too long for a reasonable factfinder to infer a causal link. Webb-Edwards v. Orange Cty. Sheriff's Office, 525 F.2d 1013, 1029 (11th Cir. 2008) (six-month gap too long to support causal connection element of prima-facie case). Moreover, Griffin has failed to present any other evidence establishing that the August 2012 actions were motivated by retaliation for the November 2011 discrimination complaint; indeed, the evidence strongly suggests they were motivated by the August 2012

_____

10. As discussed above, the August 2012 complaints did not constitute protected expression; accordingly, Title VII does not prohibit retaliation for those complaints.

non-racial complaints.  Therefore, Griffin has failed
to meet this element of the prima-facie case.

This same time lapse also dooms Griffin's claim
that he was terminated in January 2013 in retaliation
for the August 2011 complaint.  Accordingly, the court
will grant summary judgment on Griffin's retaliation
claim based on his internal complaints to management.[11]


## IV. COBRA CLAIM

Griffin contends that Neptune violated his COBRA
right to notice of his eligibility for continuation of
insurance benefits upon termination and seeks statutory
damages for the violation.  COBRA mandates that the
covered employees be given notice of their option to
extend coverage.  See 29 U.S.C. § 1166.  The parties do

---

11. The court recognizes that Griffin has
presented evidence of additional complaints to
management other than the November 2011 and August 2012
complaints specifically discussed in the opinion.
However, because Griffin did not allege racial
discrimination in those complaints, and because the
events surrounding those complaints do not raise a
strong specter of retaliation, those complaints do not
help Griffin.

not dispute that Griffin was a covered employee entitled to COBRA notice.

29 U.S.C. § 1132(c)(1) provides a private cause of action for former employees who are not provided the required notice within the time allowed by statute.  In an action for benefits under COBRA, the plan administrator bears the burden of proving that adequate COBRA notification was given to the employee.  Stanton v. Larry Fowler Trucking, Inc., 52 F.3d 723, 728-29 (8th Cir. 1995), overruled on other grounds, Martin v. Arkansas Blue Cross & Blue Shield, 299 F.3d 966 (8th Cir. 2002) (en banc).

Neptune does not dispute that Griffin was eligible for continuation of coverage under these provisions. Because Neptune administers its own plan, it was required to provide notice.  Griffin testified in his deposition that he did not receive a notice of COBRA benefits from Neptune.

Neptune argues that, regardless of whether Griffin received the notice, it needed to make only a

good-faith attempt to provide COBRA notice to Griffin and that it did so by sending the notice to him by first-class mail.  In response, Griffin argues that, regardless of whether Neptune made a good-faith attempt to provide notice, the contents of the notice were insufficient under the law to allow him to make an informed and intelligent decision whether to elect continued coverage.

In support of their arguments, the parties cite a number of cases that require plan administrators to make a 'good faith' effort to provide adequate notice. 29 U.S.C. § 1166, which sets forth the notice requirements under COBRA, states that notice must be provided, "In accordance with regulations prescribed by the Secretary."  Prior to 2004, the Secretary of Labor had not promulgated regulations defining adequate notice under § 1166; in the absence of any regulations, courts reasoned that employers need only "operate in good faith compliance with a reasonable interpretation of what adequate notice entails."  <u>Degruise v. Sprint</u>

37

Corp., 279 F.3d 333, 336 (5th Cir. 2002) (internal quotations omitted).   However, now that regulations have been promulgated, employers, and the court, must turn to them for guidance.

29 C.F.R. § 2590.606-4 sets forth the requirements for notice of the right to continuation coverage.   As to delivery of notices, the regulation states that any notices required by the regulation "shall be furnished in any manner consistent with the requirements of § 2520.104b-1."   The latter regulation provides that "the plan administrator shall use measures reasonably calculated to ensure actual receipt of the material by plan participants, beneficiaries and other specified individuals."   29 C.F.R. § 2520.104b-1(b)(1).   Examples of such methods include in-hand delivery to the employee, first-class mail, and electronic delivery under certain conditions.   Id.

The notice regulation also sets forth detailed requirements for the content of notices.   See 29 C.F.R. § 2590.606-4.   It provides that the notice

"shall be written in a manner calculated to be understood by the average plan participant and shall contain the following information," and then lists 14 different categories of information that must be included. Id.

As stated above, the employer bears the burden of proving the adequacy of notice under COBRA. Neptune submitted a declaration from its benefits coordinator attesting to her usual method of preparing COBRA notices for employees following the termination of their employment with Neptune. The coordinator attested that she follows the same procedure for each COBRA notice: she prepares the notice, makes a copy for Neptune's records, addresses an envelope using the last-known address of the employee, and takes the letter to the mailroom where staff use a postage meter to add postage and make a copy of the metered envelope for her records. She further attested that she followed her usual procedure in Griffin's case on January 23, 2013. Attached to her declaration was a

copy, she attested, of both the actual COBRA notice she prepared and the metered envelope addressed to Griffin.[12] Neptune also submitted a declaration from another employee describing Neptune's routine process for mailing through the United States Postal Service.

Griffin does not argue that the method of delivery was insufficient, and the court finds the evidence submitted sufficient to meet the requirements for delivery of notice under the applicable regulations and law. The actions taken by Neptune were reasonably calculated to deliver the notice to Griffin.

Next the court must turn to the contents of the notice. The benefits coordinator attested that attached to her declaration was a copy of the paperwork actually sent to Griffin. It tracks the requirements

---

12. The date of the postmark is unclear to the court, but the coordinator attests it is dated January 23, 2013.

The documents also contain a second envelope addressed to Griffin, this one with a handwritten address. The declaration does not explain the purpose of the second envelope.

of § 2590.606-4 in several respects.  The notice gave

him the deadline for returning the notice, the premium

amounts for himself and his spouse or dependents, and

the date by which the premium needed to be paid.

However, it does not contain most of the items required

by the regulation.  Out of the 14 categories in 29

C.F.R. § 2590.606-4, the notice completely omits nine:

> "(vi)    An  explanation  of  the
> consequences  of  failing  to  elect  or
> waiving  continuation  coverage...;  and
> a description of the plan's procedures
> for revoking a waiver of the right to
> continuation  coverage  before  the  date
> by which the election must be made;
>
> "(vii)    A  description  of  the
> continuation  coverage  that  will  be
> made  available  under  the  plan,  if
> elected, including the date on which
> such coverage will commence, either by
> providing  a  description  of  the
> coverage or by reference to the plan's
> summary plan description;
>
> "(viii)  An explanation... of any
> events  that  might  cause  continuation
> coverage to be terminated earlier than
> the end of the maximum period;
>
> "(ix)    A  description  of  the
> circumstances (if any) under which the
> maximum  period  of  continuation
> coverage may be extended due either to

the occurrence of a second qualifying event or a determination by the Social Security Administration... that the qualified beneficiary is disabled, and the length of any such extension;

"(x) In the case of a notice that offers continuation coverage with a maximum duration of less than 36 months, a description of the plan's requirements regarding the responsibility of qualified beneficiaries to provide notice of a second qualifying event and notice of a disability determination under the SSA, along with a description of the plan's procedures for providing such notices, including the times within which such notices must be provided and the consequences of failing to provide such notices. The notice shall also explain the responsibility of qualified beneficiaries to provide notice that a disabled qualified beneficiary has subsequently been determined to no longer be disabled;

"(xi) A description of the amount, if any, that each qualified beneficiary will be required to pay for continuation coverage;

"(xii) A description of . . . the qualified beneficiaries' right to pay on a monthly basis, the grace periods for payment, the address to which payments should be sent, and the consequences of delayed payment and non-payment;

42

> **"(xiii)    An explanation of the importance of keeping the administrator informed of the current addresses of all participants or beneficiaries under the plan who are or may become qualified beneficiaries; and**

> **"(xiv)    A statement that the notice does not fully describe continuation coverage or other rights under the plan, and that more complete information regarding such rights is available in the plan's summary plan description or from the plan administrator."**

29 C.F.R. § 2590.606-4.  In addition, subsection (b)(v) requires inclusion of "[a]n explanation of the plan's procedures for electing continuation coverage, including an explanation of the time period during which the election must be made, and the date by which the election must be made."   29 C.F.R. § 2590.606-4(b)(v).   While Neptune's notice letter tells the reader that the election form must be returned within 60 days of the date of the letter and instructs the reader to "follow the instructions on the next page to complete the Enclosed Election form," the instruction

page was not included.[13]   Evidentiary Submission in
Support of Motion for Summary Judgment (Doc. No.
39-13).   Accordingly, the letter fails to explain
adequately the plan's procedures for electing coverage.
Because Neptune has not shown that it provided
sufficient notice as defined under § 1166, the court
will deny summary judgment on this claim.


                              ***


     For the above reasons, summary judgment will be
entered in favor of Neptune and against Griffin on
Griffin's Title VII retaliation claim, and summary

---

     13. It is also unclear whether the actual form was
included, as the declaration only attaches a cover
sheet titled "COBRA Continuation of Coverage
Application."   Evidentiary Submission in Support of
Motion for Summary Judgment (Doc. No. 39-13).

judgment will be denied on Griffin's COBRA claim.   An

appropriate judgment will be entered.[14]

    DONE, this the 13th day of April, 2015.

                    ___/s/ Myron H. Thompson____
                    UNITED STATES DISTRICT JUDGE

------

    14. The court also has before it Griffin's motion
to amend his complaint to include, among other things,
a Title VII claim that he was terminated because he
filed an EEOC complaint.  This opinion does not address
that motion or that claim.